**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

RANDY J. AFRICANO,

Plaintiff,

v.

ATRIUM MEDICAL CORPORATION,

Defendant.

Case No. 17-cv-7238

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Randy Africano claims that a mesh product manufactured by Defendant Atrium Medical Corporation injured him following its implant during hernia surgery. This Court has already ruled on Defendant's motion for summary judgment, concluding that Plaintiff can proceed to trial on his manufacturing defect and failure to warn claims. [281]. Plaintiff has now moved to exclude the expert opinions of Defendant's causation experts, Dr. Howard Beaton and Dr. Richard Jacobs, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). [236]; [238]. For the reasons explained below, this Court denies Plaintiff's motions.

## LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert* govern the admissibility of expert testimony. Expert testimony is admissible under Rule 702 if technical or specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue." District courts act as gatekeepers and must ensure that expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v.*

1

*Carmichael*, 526 U.S. 137, 147 (1999) (internal quotation marks omitted). Relevant factors in this determination include testing, peer review, error rates, and acceptance by the relevant expert community. *See Daubert*, 509 U.S. at 593–94. The reliability inquiry is flexible, however, and not all of these factors will apply in every case. *See Kumho*, 526 U.S. at 141.

In assessing the admissibility of expert opinions, courts do not focus on "the ultimate correctness of the expert's conclusions," *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013), but "solely on principles and methodology," *Daubert*, 509 U.S. at 595. The "soundness of the factual underpinnings" and "correctness of the expert's conclusions" may affect any ultimate determination on the merits, but do not govern admissibility. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718–19 (7th Cir. 2000). The expert must explain his or her methodology and cannot "simply assert a bottom line." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Finally, the expert "may be qualified by knowledge, skill, experience, training, or education." *See Smith*, 215 F.3d at 718 (internal quotation marks omitted). District courts have "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009).

## BACKGROUND[1]

### I.      Dr. Beaton

Dr. Howard Beaton practices as a general surgeon and performs a wide variety of elective and emergency surgical procedures.  [237-1] at 2.  Of the procedures he performs, inguinal hernia repair is the most common.  *Id.*  Dr. Beaton estimates that he has performed about 4,000 inguinal hernia repairs over the course of his career. *Id.*  He has performed numerous inguinal hernia repairs with polypropylene surgical mesh, a product he considers "safe and effective with an extremely low rate of infection and is very much the standard of care."  *Id.*

Dr. Beaton attained a medical degree at the University of Rochester in 1976, completed his residency in general surgery at New York Hospital—Cornell Medical Center in 1981, and has since served as an attending surgeon for over thirty-eight years at several institutions.  *Id.*  He currently serves as an attending surgeon at New York Presbyterian Hospital and Associate Professor of Surgery at Weill Cornell Medical College.  *Id.*

In his expert report, Dr. Beaton summarizes the following relevant facts giving rise to his expert opinions.   On December 10, 2013, Plaintiff underwent an inguinal hernia repair by Dr. Timothy Phillips at the Marshfield Clinic.  *Id.* at 3.  The procedure included Dr. Phillips' insertion of Defendant's ProLite mesh beneath the aponeurosis of the external oblique muscle as an onlay on top of the floor of the

---

[1] This Court presumes familiarity with the facts of this case, as set forth in detail in this Court's summary judgment opinion.  [281].  The background section therefore focuses upon the facts relevant to the pending *Daubert* motions.

inguinal canal. *Id.* Dr. Phillips saw Plaintiff for a follow-up on December 19, 2013, at which time it appeared that Plaintiff's incision had been healing well without any signs of infection. *Id.* Plaintiff saw a Dr. Maria Alvarez on January 20, 2014 for severe cough and possible pneumonia. *Id.* The notes indicate that Plaintiff had also gone snowmobiling a few weeks after his hernia repair and that Plaintiff had a history of smoking. *Id.*

Dr. Phillips saw Plaintiff again on June 11, 2015 due to Plaintiff's complaints of a solid-feeling mass in his right groin, high and lateral to the site of his hernia repair. *Id.* Dr. Phillips ordered a sonogram which revealed a 2 x 2 x 4 cm. fluid collection that a radiologist interpreted as being consistent with an inflammatory reaction or inflammatory process. *Id.* A few months later, on September 18, 2015, Dr. Phillips examined Plaintiff again, and did not document any evidence of infection. *Id.* On September 28, 2015, an MRI of Plaintiff's right groin revealed a 3.4 x 1.4 x 2.6 cm fluid collection, that a radiologist interpreted as a "seroma related to prior surgery." *Id.*

Ten months later, on July 27, 2016, Plaintiff presented to the emergency room at Northwestern Medical Center with a three-week history of pain, swelling, redness, and tenderness in his right groin. *Id.* at 4. He did not have a fever or a low white blood cell count. *Id.* The physicians there performed an incision and drainage, revealing "2-3 cc bloody purulent fluid." *Id.* A CAT scan revealed a 3.5 x 2.8 x 1.3 cm fluid collection that a radiologist interpreted as "suspicious for infection and abscess." *Id.* A "gram stain" revealed the presence of many red blood cells but no white blood

cells or organisms. *Id.* A microbiology culture three days later revealed rare staphylococcus lugdunensis as a "contaminant or colonization." *Id.*

Dr. Nagle conducted surgical "exploration of his right groin" two days later on July 29, 2016. *Id.* Dr. Nagle noted that the "patient reports a complication of hematoma following the surgery," and that a "cavity was entered, with discharge of dark bloody fluid. There was also significant necrotic tissue in the cavity." *Id.* Dr. Nagle also observed partially unincorporated mesh. *Id.* On August 5, Dr. Phillips examined Plaintiff and observed Plaintiff's wound to be clean and healing. *Id.*

Based upon his review of the record, Dr. Beaton renders several opinions in his expert report. First, he opines that Plaintiff developed a hematoma in the right inguinal canal involving the implanted mesh following his hernia repair on December 10, 2013, and that this could have been caused by the surgical procedure itself, violent movement when snowmobiling, coughing due to smoking and pneumonia, or a combination of these factors. *Id.* Dr. Beaton further opines that the findings of the fluid collection in June 2015 and the MRI in September 2015 are consistent with a seroma related to the hematoma which "had not completely resorbed." *Id.* Dr. Beaton observes that, despite the ER doctors' observation in July 2016 that the fluid they removed appeared "purulent," no white blood cells appeared on the gram stain, meaning that "no infection or abscess was present." *Id.* According to Dr. Beaton, the ER doctors never observed the mesh in the wound because their incision only extended into the subcutaneous tissue, not deep to the muscles; for that reason, the staphylococcus lugdunensis that the microbiology culture detected could not have

come from the mesh. *Id.* at 4–5. Dr. Beaton states that staphylococcus lugdunensis is a type of skin bacterial commonly found in the groin region and that, in Plaintiff's case, it "was probably introduced from the skin during the procedure done in the ER." *Id.* at 5.

Dr. Beaton additionally explains that the occurrence of a hematoma and/or seroma in a surgical wound is common following hernia repair surgery but cannot be caused by an infection. *Id.* Dr. Beaton opines that Plaintiff only experienced a hematoma or seroma, and that there is "no evidence that his mesh was ever infected." *Id.*

## II.    Dr. Jacobs

Dr. Richard Jacobs is a board-certified internal medicine physician who has practiced and taught infectious diseases at the University of California San Francisco since 1980. [239-4] at 2. During the course of his career, Dr. Jacobs has treated patients with prosthetic mesh infections and with abscesses. *Id.*

Like Dr. Beaton, Dr. Jacobs recounts Plaintiff's medical history and summarizes his medical records. He then opines, based upon his summary of the records, that the mesh placed in Plaintiff on December 10, 2013 was not contaminated; that Plaintiff never had an infection of his mesh; and that the most likely explanation for Plaintiff's clinical symptoms and test results comes from an "acute bleed into a preexisting seroma or chronic hematoma." *Id.* at 6.

## ANALYSIS

Plaintiff moves to exclude Dr. Beaton on the basis that he lacks qualifications to render opinions relating to infections. [237] at 1. Plaintiff also argues that both Drs. Beaton's and Jacobs' opinions should be excluded as unreliable. *Id.* at 1; [239] at 1. This Court will first address Dr. Beaton's qualifications and then the reliability of both experts' opinions.

### I.     Dr. Beaton's Qualifications

Taking first Dr. Beaton's qualifications, Federal Rule of Evidence 702 deems an expert qualified "by knowledge, skill, experience, training or education." This is a "liberal standard; the expert need only have some 'specialized knowledge that would assist the trier of fact.'" *Prayitno v. Nextep Funding LLC*, No. 17 C 4310, 2019 WL 6497374, at *3 (N.D. Ill. Dec. 3, 2019) (quoting *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993)). This Court finds Dr. Beaton undoubtedly qualified to render his causation opinions in this case. He is a practicing surgeon with over three decades of experience and has performed over four thousand inguinal hernia repairs over the course of his career, including numerous inguinal hernia repairs using polypropylene surgical mesh. [237-1] at 2–3. Dr. Beaton therefore has extensive knowledge and experience in both the surgery and the product Plaintiff claims caused his injuries.

Plaintiff stresses that because Dr. Beaton is neither a pathologist nor infectious disease expert, he lacks the specialized expertise to offer the opinions that the infection detected from the July 2016 microbiology culture did not come from the mesh implant and that the mesh itself was never infected. [237] at 5. True, Dr.

Beaton is not an infectious disease specialist. That fact, however, does not render Dr. Beaton unqualified to opine on infections or other complications from inguinal hernia repairs—a surgery he commonly performs and has performed for over three decades. His specialized knowledge and experience undoubtedly qualify Dr. Beaton under *Daubert* and Rule 702. And in any event, courts ordinarily "impose no requirement that an expert be a specialist in a given field." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)). The fact that Dr. Beaton does not specialize in infectious diseases, thus, goes to the "weight to be placed on that opinion, not its admissibility." *Id.*; *see also Prayitno*, 2019 WL 6497374, at *6 (observing that to "the extent that plaintiff argues that [an expert's knowledge] is not narrowly specialized enough in the relevant field to point to the correct conclusion, the way to test his expertise is not at the threshold in a *Daubert* motion, but at trial though opposing evidence or cross-examination"). For these reasons, this Court finds Dr. Beaton sufficiently qualified to testify in this case.

## II.     Reliability

Next, on the issue of reliability, Plaintiff objects to both Drs. Beaton's and Jacobs' opinions on the basis that they failed to review the deposition transcript of Dr. Amy Holmstrom, the resident physician who assisted with the incision and drainage procedure performed on Plaintiff when he presented to the emergency room on July 27, 2016. Specifically, Plaintiff seeks to exclude Dr. Beaton's opinions because he did not consider Dr. Holmstrom's testimony that the "fluid sample used for the microbiology tests was not taken from the abscess cavity surrounding the mesh, but

8

rather was blood from Mr. Africano's leg," and that he erroneously assumed instead that "the sample used for the negative microbiology tests was from the main cavity surrounding the mesh." [237] at 6–7. Similarly, Plaintiff argues that Dr. Jacobs ignores Dr. Holmstrom's deposition testimony that the fluid resulting in negative microbiology tests came from Plaintiff's leg, not the area surrounding the mesh; this failure, Plaintiff contends, led Dr. Jacobs to erroneously conclude that Plaintiff never experienced an infection. [239] at 6–9, 14. This Court is not persuaded by Plaintiff's objections for several reasons.

First, neither doctor expressly makes the assumption that the fluid sample came from the cavity surrounding the mesh. Rather, with respect to the fluid sample, Dr. Beaton merely stated that: (1) no white blood cells appeared on the gram stain, meaning the testing revealed no infection or abscess; and (2) the incision that produced the fluid sample only extended into the subcutaneous tissue and not to the muscle. [237-1] at 4. Like Dr. Beaton, Dr. Jacobs also observed that the tests from the fluid sample revealed no white blood cells, no bacterial organisms, and many red blood cells. [239-4] at 4. Thus, Plaintiff's accusation that the doctors made wrongful assumptions simply does not square with the record.

Moreover, even if the experts made any inaccurate assumptions, the "fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013). To the extent Plaintiff believes that either expert makes unfounded or incorrect assumptions, he remains free to address those deficiencies

through vigorous cross-examination. *Id.* By the same token, neither *Daubert* nor the Federal Rules of Evidence requires an expert review to *all* of the facts; in fact, only a "sufficient amount is required." *Gomez v. Palmer*, No. 11 C 1793, 2016 WL 212952, at *4 (N.D. Ill. Jan. 19, 2016) (quoting *Hoskins v. Trucking*, No. 07 C 72, 2010 WL 4000123, at *12 (N.D. Ind. Oct. 12, 2020)). Accordingly, to the extent Plaintiff faults the experts with ignoring Dr. Holmstrom's deposition testimony, Plaintiff can redress that complaint through vigorous cross-examination. *See Padilla v. Hunter Douglas Window Coverings, Inc.*, 14 F. Supp. 3d 1127, 1148 (N.D. Ill. 2014) ("To the extent that [an expert] relied on certain information from the depositions while not considering others, this goes to weight of his testimony and not its admissibility."); *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 824 (N.D. Ill. 2013) (declining to preclude an expert's opinions based upon an alleged selective reading of a witness deposition).

Plaintiff also contends that Drs. Beaton's and Jacobs' opinions are insufficiently reliable because they ignored pertinent facts in reaching their conclusions that Plaintiff's mesh was never infected. With respect to Dr. Beaton, Plaintiff objects that his expert report does not address Dr. Holmstrom's deposition testimony and that Dr. Nagle noted an infected mesh when he performed Plaintiff's explant surgery in 2016. [237] at 9–16. Plaintiff criticizes Dr. Jacobs also for not addressing Dr. Nagle's contemporaneous notes of an "infected" mesh. [239] at 9–13.

Again, however, Plaintiff's objections that the experts failed to consider facts (or that they placed too great an emphasis on certain facts over others) "generally go to the weight of the expert's opinion, not its admissibility." *Jordan v. Dominick's*

10

*Finer Foods*, 115 F. Supp. 3d 950, 963 (N.D. Ill. 2015). Thus, while Plaintiff remains free to vigorously cross-examine Defendant's experts, present his own countervailing expert testimony, and argue why the trier of fact should not accord their opinions any weight, this Court will not exclude either expert's opinions due to their alleged failure to consider relevant facts. *See Burton v. Am. Cyanamid*, 362 F. Supp. 3d 588, 601 (E.D. Wis. 2019) ("That [an expert] did not consider and exclude *all* possible factors . . . goes to the weight and not the admissibility of his testimony."); *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013) (noting an expert's decision of which "variables to include in a regression analysis is normally a question that goes to the probative weight of the analysis rather than to its admissibility").

For these reasons, this Court rejects Plaintiff's arguments concerning reliability.

## CONCLUSION

For the reasons stated above, this Court denies Plaintiff's motions to exclude Dr. Beaton [236] and Dr. Jacobs [238]. All pending dates and deadlines stand.

E N T E R:

Dated: September 20, 2021

_____
MARY M. ROWLAND
United States District Judge

11